IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LESLEY C. STEPHENS, | ) | No. 06 C 0176 |
| Plaintiff, | ) | |
| | ) | The Honorable William J. Hibbler |
| v. | ) | |
| MICHAEL J. PICARDI, CHARLES ERICKSON, KEVIN MURRAY, GLEN TATARA, and WILLIAM LONERGAN, in their individual capacities as agents of the City of Chicago and the CITY OF CHICAGO, a municipal corporation, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On January 12, 2006, Lesley C. Stephens filed a complaint with this Court alleging that the Defendants denied him a series of promotions violation of Title VII and 42 U.S.C. § 1981. On June 1, 2006, the Defendants moved for Summary Judgment asserting that Stephens was not promoted solely because he was less qualified than the other competing candidates. For the reasons set forth below, the Defendants' joint motion for Summary Judgment on all claims is GRANTED.

### I.   Factual Background

Lesley C. Stephens has been continuously employed by the City of Chicago since 1979. (Def. 56.1(a) St. ¶ 10.) Stephens has held various positions including: motor truck driver,

1

acting assistant superintendant, accident adjuster, and acting general foreman of the Department of Fleet Management. (3rd Am. Compl. ¶¶ 14-19.) In 1993, the City reorganized the Fleet Department and Stephens was reassigned from his supervisory role as foreman to his current position as an accident adjuster. (*Id.*) As an accident adjuster, Stephens is responsible for appraising and photographing damaged City vehicles, as well as obtaining maintenance estimates from outside repair shops. (Pl. 56.1(b)(3) St. ¶ 3.)

Stephens, who is African-American, claims that in 1994, he began to verbalize complaints based on what he perceived to be racial animus in his department. (3rd Am. Compl. ¶ 20.) In 1997, Stephens filed a lawsuit against the City alleging racially discriminatory hiring practices.[1] (*Id.* at 22.) On July 6, 2004, Stephens entered into a settlement agreement that resolved his case. Stephens, who has continued to work for the City after the settlement agreement, now alleges that the Defendants have stymied his career in retaliation for previously suing the City.

*The Promotions*

Stephens applied for four separate supervisory positions in 2004. On August 27, 2004, Stephens interviewed for the position of Manager of Vehicle Maintenance in the Fleet Department. (Def. 56.1(a) St. ¶ 50.) On September 10, 2004, Stephens interviewed for the position of Director of Maintenance Operations in the Fleet Department. (Def. 56.1(a) St. ¶ 76.) On September 22, 2004, Stephens interviewed for the position of Manager of Vehicle Maintenance in the Bureau of Police Motor Maintenance. (Def. 56.1(a) St. ¶ 103.) Finally, on October 12, 2004, Stephens interviewed for the position of Manager of Vehicle Maintenance in the Aviation Department. (Def. 56.1(a) St. ¶ 115.) Stephens was not selected for any of the positions for which he applied.

---

[1] The lawsuit was assigned case number: 97 C-6948.

*The August 27, 2004 Interview*

Defendant Kevin Murray interviewed Stephens for the position of Manager of Vehicle Maintenance.[2] The position required the supervision and co-ordination of automotive repair operations and the preparation of reports on equipment conditions. (Def. 56.1(a) St. ¶ 49.) Murray asked all the candidates the same interview questions, and ultimately recommended Cleveland Thomas to fill the vacancy.[3] (Def. 56.1(a) St. ¶ 58.) At the time of the interview, Thomas was serving as the Acting Manager of Vehicle Maintenance on a day to day basis. (Murray Dep. at 161.) Thomas was given the title of Acting Manager by Commissioner Michael J. Picardi.[4] (Murray Dep. at 80.)

Murray testified that he chose Thomas in part because Thomas had previous supervisory experience, as well as a prominent role in assisting the Fleet Department convert its computer database to a new Windows-based system. (Def. 56.1(a) St. ¶¶ 60, 62.) Additionally, Thomas indicated on his application that he was willing to work any shift on any day. (Def. 56.1(a) St. ¶ 66.) Finally, Murray stated that Thomas's answers to the interview questions illustrated that Thomas had a clear plan to improve vehicle maintenance within the department. (Def. 56.1(a) St. ¶ 64.) At the time of the interview, Murray did not know that Stephens had previously filed a lawsuit against the City of Chicago. (Def. 56.1(a) St. ¶ 52.)

*The September 10, 2004 Interview*

---

[2] Defendant Charles Erickson was also present at the interview, but did not conduct any of the questioning. (Def. 56.1(a) St. ¶ 51.)

[3] Thomas is African-American.

[4] Picardi was the Commissioner of the Department of Streets and Sanitation during the relevant and time period and is the highest ranking defendant in this lawsuit.

3

Defendant Charles Erickson interviewed Stephens for the position of Director of Maintenance Operations in the Fleet Department. (Def. 56.1(a) St. ¶ 76.) The Director's duties included the planning and scheduling of regular and seasonal maintenance of City vehicles, the supervision of the tradesmen charged with the maintenance, and the oversight of departmental inventory. (Def. 56.1(a) St. ¶ 77.) Erickson asked each of the candidates the same questions, and ultimately selected Kevin Murray for the position. At the time of the interview, Murray was serving as the Acting Assistant Commissioner of Maintenance Operations. (Murray Dep. at 34.) As with Cleveland Thomas, Murray was given the acting title by Commissioner Picardi.

Erickson stated that he recommended Murray in part because Murray had experience working with Fleet's inventory. (Def. 56.1(a) St. ¶ 85.) Specifically, Murray conducted a comprehensive inventory analysis of the Fleet department, a task that took 10 months to complete. (*Id.*) Murray also had experience performing on-site inspections of parts suppliers throughout the country. (Def. 56.1(a) St. ¶ 88.) Erickson also noted that Murray had received managerial training through his participation in the Intergovernmental Executive Development Program. (Def. 56.1(a) St. ¶ 89.) Finally, Erickson was impressed by Murray's answers to the interview questions and his willingness to work any shift on any day. (Def. 56.1(a) St. ¶ 91.) Erickson testified that at the time of the interview, he did not know Stephens. (Erickson Dep. at 144.)

*The September 22, 2004 Interview*

Defendant Glen Tatara interviewed Stephens for the position of Manager of Vehicle Maintenance in the Bureau of Police Motor Maintenance. (Def. 56.1(a) St. ¶ 103.) Tatara testified that he was looking for a candidate who had experience working

4

with car dealerships and a familiarity with the disciplines within the Bureau of Police Motor Maintenance. (Def. 56.1(a) St. ¶ 107.) According to Tatara, he recommended Angel Lopez for the promotion because he possessed both of the aforementioned characteristics. (Def. 56.1(a) St. ¶ 107.) Additionally, Lopez stated that he was willing to work any shift on any day. (Def. 56.1(a) St. ¶ 112.) Prior to his promotion, Lopez had served as an acting manager, but not for a significant or extended period of time. (Tatara Dep. at 61.)

The first time Tatara met Stephens was during the September 22, 2004, job interview. (Def. 56.1(a) St. ¶ 104.) Prior to this lawsuit, Tatara had no knowledge of the acrimony between Stephens and the Fleet Department. (*Id.*) Moreover, Stephens stated he has no evidence that Tatara harbored any feelings towards him one way or the other. (Def. 56.1(a) St. ¶ 105.)

*The October 12, 2004 Interview*

Defendant William Lonergan interviewed Stephens for the position of Manager of Vehicle Maintenance – Aviation. (Def. 56.1(a) St. ¶ 115.) The manager's responsibilities included accident investigation, accident review board participation and budget preparation. (Def. 56.1(a) St. ¶ 120.) Lonergan asked each candidate the same questions and ultimately recommended Walter West for the promotion. (*Id.*) Lonergan testified that West's previous budgetary and supervisory experience, which included oversight of Stephens's work, contributed to West being selected over Stephens. (Def. 56.1(a) St. ¶¶ 121-125.) Lonergan also testified that he came away with the impression that Stephens would have been "overzealous" with respect to disciplining subordinates. (Def. 56.1(a) St. ¶ 132.)

5

After West was recommended for the promotion, he was interviewed by John A. Roberson[5], the Commissioner of the Aviation Department. (Def. 56.1(a) St. ¶ 134.) Commissioner Roberson interviewed the recommended candidates to ensure that qualified people were being selected. (Def. 56.1(a) St. ¶ 137.) Commissioner Roberson testified: "Based on my interview of Mr. West, I considered him to be the best qualified candidate for the position ..." (Roberson Aff. ¶ 11.) Prior to the job interview, Lonergan did not know Stephens. (Def. 56.1(a) St. ¶ 117.) Moreover, Lonergan did not know Stephens had once filed a lawsuit against the City. (*Id.*)

*The Claims*

Stephens's five-count Third Amended Complaint alleges: unlawful retaliation by the City in violation of Title VII of the Civil Rights Act of 1964 (Count I); unlawful retaliation by the City, Picardi, Erickson and Murray in violation of 42 U.S.C. § 1981 (Count II); unlawful retaliation by the City, Picardi and Erickson in violation of 42 U.S.C. § 1981 (Count III); unlawful retaliation by the City, Picardi and Tatara in violation of 42 U.S.C. § 1981 (Count IV); and unlawful retaliation by the City and Lonergan in 42 U.S.C. § 1981 (Count V).

## II. Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and that

---
[5] Commissioner Roberson is African-American.

6

judgment as a matter of law should be granted in their favor. *Celotex*, 477 U.S. 324. Once the moving party has met the initial burden, the nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County*, Ill., 424 F.3d 659, 667 (7th Cir. 2005). The nonmoving party must produce specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Finally, all evidence and inferences must be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. 255.

### III. Analysis

Stephens condemns not only the procedure, but the results of the City's hiring practices. To make his argument, Stephens relies on Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Section 1981 prohibits racial discrimination in employment contracts, while Title VII prohibits an employer from retaliating against an employee that has previously raised claims of racial discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2408, 165 L. Ed. 2d 353 (2006); 42 U.S.C. § 2000e-3(a).

A. *The Prima Facie Requirement*

As a threshold matter, Stephens must make out a *prima facie* case for retaliation using either the direct method or the indirect burden-shifting approach.[6] *Nichols v. Southern Ill. Univ.*, No. 06-2688, 2007 U.S. App. LEXIS 29865 at *25-26, 2007 WL 4553649 (7th Cir. Dec. 28, 2007). Under the direct method, Stephens must show that: (1) He engaged in a statutorily protected activity; (2) He suffered an adverse action taken by

---

[6] The *prima facie* requirements for retaliation under Title VII also apply to retaliation claims under Section 1981. *Humphries v. CBOC's W. Inc.*, 474, F.3d 387, 404 (7th Cir. 2007).

7

the Defendants; and (3) There was a causal connection between the adverse action and the statutorily protected activity. *Id.* Under the indirect method, Stephens must establish that: (1) He engaged in a statutorily protected activity; (2) He met the City's legitimate expectations; (3) He suffered an adverse employment action; and (4) He was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.*

Here, Stephens is unable to carry his burden under either approach.

B. *The Retaliation Claims*

Kevin Murray, William Lonergan and Glen Tatara all interviewed, and ultimately passed over Stephens for the coveted promotions. Stephens claims to have suffered this injustice because the Defendants were retaliating against him for previously suing the City.[7] Common sense and case law doom this argument. It is axiomatic that there can be no claim of retaliation where the defendant has no knowledge of the plaintiff's previous lawsuit. *See Treadwell v. Office of the Ill. Sec'y. of State*, 455 F.3d 778, 781 (7th. Cir. 2006). In *Treadwell*, the plaintiff filed a complaint with the EEOC alleging he was the victim of workplace discrimination. *Id.* at 780. Approximately three months later, the plaintiff was demoted and transferred to a less desirable location. *Id.* The plaintiff claimed that the he was being punished for complaining to the EEOC; the Seventh Circuit disagreed. The Court noted that there was no evidence that the plaintiff's supervisor

---

[7] The gravamen of Stephens's Complaint is that he was denied four promotions in 2004, but his brief also touches on other retaliatory acts such as: employees shouting and staring at him, being stripped of job duties and getting poor work assignments, and not receiving overtime opportunities. (Def. 56.1(a) St. ¶8.) Stephens has not presented sufficient evidence to persuade the Court that these claims are actionable. With respect to overtime pay, Stephens agrees that from the period of July 1, 2004, to early December 2004 he received overtime pay while his fellow accident adjusters (Joseph Lazzaro and David Moussa) did not. (Def. 56.1(a) St. ¶ 13.) Stephens's other allegations similarly fall short of being viable. *See Nichols*, 2007 U.S. App. LEXIS 29865 at *15 (noting that actionable claims require more than just alteration of job responsibilities and that "not everything that makes an employee unhappy is an actionable adverse action").

8

knew about the EEOC complaint, ergo there could be no retaliation. *Id.* at 782. *See also Gilty v. Vill. of Oak Park*, 919, F.2d 1247, 1255-56 (7th Cir. 1990) (denying retaliation claim where supervisor suspended plaintiff prior to learning about plaintiff's lawsuit).

Similarly here, Stephens admits that Murray, Lonergan and Tatara had no knowledge of his previous lawsuit. In fact, Lonergan and Tatara met Stephens for the first time during the job interviews. It is impossible for the defendants to retaliate against Stephens for suing the City *when they didn't know that he sued the City.* Thus, Stephens has failed to make out a *prima facie* case under the direct approach because he can not prove the third element, i.e. there was no causal connection between Stephens's prior lawsuit and the decision to deny him a promotion.

Likewise, Stephens can not sustain his claim via the indirect method. Assuming *arguendo* that Stephens can make out a *prima facie* case under the indirect method, Stephens must then put forth evidence showing that the reasons given by the Defendants as to why he was not selected were lies meant to conceal the Defendants' true motive. *Nichols*, U.S. App. LEXIS 29865 at *25-26. Stephens argues that the Defendants motive was to punish him for suing the City. But, where the Defendants had no knowledge of the prior lawsuit, the Defendants could not have been motivated by the prior lawsuit. Summary Judgment is granted on all claims with respect to Defendants Murray, Lonergan and Tatara.

*Charles Erickson*

Defendant Charles Erickson also claims that he had no knowledge of Stephens's prior lawsuit against City. Stephens disputes this assertion because Erickson's job title, Projects Administrator, required Erickson to become familiar with complaints made by

Fleet employees.[8] Thus, it is a closer call as to whether Stephens can make out a *prima facie* case regarding the September 10, 2004, interview. Again, assuming *arguendo* that Stephens can get past the initial hurdle, he then must prove that Erickson's proffered reasons for denying him a promotion were pretextual. On this point, Stephens has not presented enough evidence to defeat the motion for Summary Judgment.

First, Stephens has no evidence that Erickson is a racist. Stephens's deposition spells this out:

> Q. [Do] you have any reason or evidence to believe that Charlie Erickson is personally a racist?
>
> A. No. (Stephens Dep. at 254.)

Next, Erickson provided four reasons why Stephens was not chosen to be the Director of Maintenance Operations: (1) Kevin Murray was willing to work more shifts than Stephens; (2) Murray, unlike Stephens, had recent managerial training; (3) Stephens's answers to the interview questions were not as thorough as Murray's responses; and (4) Murray had conducted a substantial inventory analysis of the Fleet Department.

Regarding point number one, Erickson directs the Court's attention to Stephens's Willingness and Ability Statement. The Willingness and Ability Statement was filled out by all the candidates for the Director of Maintenance Operations. Stephens's form stated that he would have difficulty working the following shifts: 11:00 p.m. to 7:00 a.m. and 3:30 p.m. to 11:30 p.m. By contrast, Murray stated he would have no problem working any shift on any day. The "willingness" and "ability" to work particular shifts is certainly a reasonable factor in evaluating a candidate.

---

[8] Stephens never actually spoke to Erickson about his complaints and has no evidence that Erickson knew of his previous claims of discrimination.

10

Erickson also contends that Murray gave thorough answers to his questions while Stephens's answers were somewhat lacking. For example, in response to the question: "what steps will you take to move the department forward?" Murray responded that he would work with tradesmen to upgrade their skills, evaluate costs and work with people to develop a team operation. Stephens responded to the same question: "Don't know yet ..." According to Erickson, he was simply underwhelmed by Stephens's interview performance.

Finally, Erickson asserts that Murray had more relevant job experience than Stephens. As noted *supra*, Murray conducted a comprehensive 10 month inventory analysis of the Fleet department. Moreover, Murray had completed on-site inspections of the Department's parts suppliers in different regions of the United States including Florida and Virginia. Murray had also received managerial training with the Intergovernmental Executive Development Program. In Erickson's estimation, Murray's experience and formal training justified his selection for the Director's job.

Erickson's proffered reasons for selecting Murray appear to be reasonable. Stephens admits he has no evidence to suggest that Erickson is a racist, and the Court has not discerned any evidence to suggest that Erickson was motivated by retaliatory animus. Accordingly, Summary Judgment is granted with respect to Defendant Charles Erickson. *See Sartor v. Spherion Corp.*, 388 F.3d 275, 279-281 (7th Cir. 2004) (plaintiff's claim of discrimination fails where the employer promoted an individual that could be objectively viewed as more qualified); *Guerrero v. Ashcroft*, 253 F.3d 309, 315 (7th Cir. 2001) (Summary Judgment is granted for employer that offered legitimate non-pretextual reasons for declining to promote an employee).

*Michael Picardi*

Commissioner Michael Picardi was nominally the final authority with respect to all hiring decisions within the Fleet Department. To whit, Stephens claims that Picardi had a role in the alleged retaliation that took place during the 2004 hiring season. But, Picardi never interviewed Stephens. Nor did Picardi review the application materials, interview notes or the candidate rating forms. Moreover, Picardi did not discuss Stephens's interviews, and often delegated his hiring authority to subordinates. Here, the record demonstrates that Picardi was not significantly involved in any of the disputed interviews.

According to Picardi, his *modus operandi* was to simply approve the hiring recommendations given to him by the primary interviewers. Picardi's deposition testimony bears this out:

> Q: Is it accurate to say [you] never rejected the recommendations of subordinate personnel
> 
> A: Yes

(Picardi Dep. at 65.)

In contrast to the other Defendants, Picardi knew that Stephens had sued the City. Again, Picardi's deposition testimony is illuminating:

> Q: You heard that [Stephens] had been involved in a lawsuit against the City. I'm asking if while you were commissioner or first deputy you became aware of that [the] law suit involved a claim of racial discrimination?
> 
> A: I don't recall if that was the specific claim.
> 
> Q: But you did know it was a claim that he was making?
> 
> A: I knew it was a lawsuit. I didn't know that it was – I don't recall the specific claim in the lawsuit.

(Picardi Dep. at 59.)

Knowledge of the prior lawsuit is a necessary but not sufficient condition of Stephens's retaliation claim. There still must be evidence that Picardi was motivated by that knowledge to deny Stephens a promotion. After reviewing the record, the Court has determined that Picardi's involvement with the interview process was so minimal that the facts do not support the claim of retaliation. Turning once again to Picardi's deposition testimony:

> Q: So it's true that you didn't participate in any of the interviews for any positions that [Stephens] applied for?
>
> A: I did not participate in the interviews.
>
> Q: Would I be accurate [in saying that] you totally relied on the recommendations made to you by subordinate personnel for those promotions?
>
> A: Yes

(Picardi Dep. at 64-65.)

Stephens urges the Court to infer that Picardi directed his subordinates to select candidates other than Stephens. Lacking any direct evidence, Stephens rests his claims primarily on the alleged statements of Picardi's secretary Millie Velazquez and fellow employee Ruth Figueroa. Stephens's brief argues that: "Velazquez told [Figueroa] that Picardi was very upset with Plaintiff for having raised complaints of discrimination in the past ... and that he would never be promoted." (Pl. Mem. of Law in Opposition to Summary Judgment at 6.) Stephens's reliance on Figueroa testimony is not persuasive. Figueroa testified as follows:

> Q. Have you had any conversations with Michael Picardi in which Mr. Picardi complained to you about Les Stephens?

13

> A. No.
>
> Q. So if any of these persons who I just mentioned [the Defendants] had any complaints about Les Stephens, you would have heard about that from what someone else told you; is that correct?
>
> A. Yes.

(Figueroa Dep. at 20.)

Stephens argues that Picardi allegedly made a discriminatory statement to Velazquez, and Velazquez allegedly repeated that statement to Figueroa, who then repeated the statement to Stephens. Thus, a good portion of Stephens's "evidence" consists of nothing more than textbook hearsay. Even if the statement were true, it does not change the fact that Stephens was interviewed and passed over by four separate individuals, none of whom was Picardi. *See Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722, 724 (7th Cir. 1998) ("even if Goldberg's comment could be viewed as discriminatory, it does not serve as evidence plaintiff was terminated for discriminatory reasons because Goldberg, even though plaintiff's supervisor, was not a decision maker as to the decision at issue."); *Balamut v. Abraham*, No. 97 C 4174 & 97 C 4313, Consolidated 2004 U.S. Dist. LEXIS 26172, at *11, 2004 WL 3021395 (N.D. Ill. Dec. 28, 2004) (discriminatory statements made by a manager uninvolved in the hiring process can not be evidence of retaliation).

Stephens's brief also claims Supervisor of Personnel Laura Johnston "frequently vented to Figueroa about plaintiff." (Pl. Mem. of Law in Opposition to Summary Judgment at 6.) Stephens uses the "venting" Johnston to show that he would never be promoted presumably because the Fleet Department was under Picardi's Svengali-like influence. But, Johnston's deposition testimony paints a markedly different picture:

14

> Q. In any communication you've ever had with Mr. Picardi, did the name of Mr. Stephens ever come up in any fashion?
>
> A. No.
>
> Q. No topic at all?
>
> A. No.

(Johnstone Dep. at 18.)

Contrary to Stephens's assertions, the record does not show that Picardi recruited people to retaliate against Stephens. It bears repeating: Picardi did not discuss Stephens's application with his subordinates, and some interviewers did not know Stephens had sued the City. All of the interviewers have articulated cogent and coherent explanations for why they did not recommend Stephens. Their reasons were varied and included both the subjective (Stephens's poor interviewing skills) to the objective (Stephens's Willingness and Ability Form stated he would have difficulty working several shifts).

Stephens resolutely insists that the real reason he was not selected was Picardi's behind-the-scenes machinations. Stephens's insistence is not enough. Stephens must present actual evidence of retaliation, and he has not done so. The nonmoving party can not generate an issue of fact with mere speculation or conjecture. *Borcky v. Maytag*, 248 F.3d 691, 695 (7th Cir. 2001). Summary Judgment is granted on all claims with respect to Commissioner Michael Picardi.[9]

C. *Pattern and Practice Claims*

The City's guidelines require each candidate to have an equal opportunity to pursue promotions for vacant positions. Stephens contends, however, that the City's

---

[9] The Court has determined that Stephens does not have a viable claim of retaliation against the City employees. Thus, Stephens has no claim of retaliation against the City itself. *See Finwall v. City of Chicago*, 490 F.Supp. 2d 918, 927 (N.D. Ill. 2007).

15

hiring procedures are nothing more than a rubber stamp for Picardi's favorite candidates. According to Stephens, Commissioner Picardi preordained the successful candidates by appointing them as acting managers prior to the job interviews. Thus, the candidates with the acting title were performing the very jobs for which they were interviewing. Out of the four promotions, two of the candidates (Cleveland Thomas and Charles Erickson) spent significant time as acting managers prior to their promotions. One of the candidates, Angel Lopez, filled in as an acting manager sporadically. The final candidate, Walter West, was never an acting manager. Stephens argues that the City's pattern and practice of appointing acting managers prior to the interviews violates 42 U.S.C. § 1981.

In a large municipality it is inevitable that individuals will take time off from work. The City is not immune from having its employees fall ill, retire, take maternity leave or depart for new jobs. As a practical matter, the City must continue to provide essential services while simultaneously searching for new employees. In the City's view, temporary managers minimize the disruption of services while new managers are interviewed; the Court does not disagree. Defendant Glen Tatara testified about the circumstances surrounding Lopez's appointment as an acting manager:

> Q. So for what period of time do you think [Lopez] filled in?
>
> A. It was the period of time ... that [Lopez's supervisor] retired until the time we were able to fill the job...

(Tatara Dep. at 61.)

It is certainly reasonable to have an acting manager oversee the department during the search for a permanent replacement. Generally, the Court will not substitute its own judgment for that of a municipality concerning how to best run the City. *See Mejia v. U.S Dep't of Housing & Urban Dev.*, 688 F.2d 529, 534 (7th Cir. 1982) (refusing to prohibit

16

city practice of funding commercial redevelopment projects with community development block grants). The Court's inquiry begins and ends with whether the City's practices comport with the Federal Constitution and applicable statutes. The Court declines the invitation to proscribe the City's custom of appointing temporary managers.[10]

The Court has determined that the City's practice of appointing temporary managers does not run afoul of the law. Thus, the Court now must determine whether the custom was applied in an impermissible manner: "Where the custom itself does not establish wrongdoing, there must be evidence of a course of events or circumstances that permit an inference of deliberate indifference or tacit authorization of the offensive acts." *Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir. 1986). As already discussed *supra*, there is no evidence that the practice of appointing acting managers was used to punish Stephens for suing the City. Where there is no retaliation, there can be no pattern and practice of retaliation. As a result, Stephens's pattern and practice claim can not withstand Summary Judgment.[11]

## IV. CONCLUSION

The Defendants presented a litany of work-related reasons why Stephens was not promoted. To withstand Summary Judgment, Stephens had to show that the Defendants'

---

[10] Of course, if the City were to abuse this practice by appointing acting managers in order to circumvent the interviewing process and to prevent individuals in a protected class from being promoted, the Court would be well within its right to intervene. Here, that argument would fail because Cleveland Thomas, an African-American, was appointed as an acting manager for one of the positions sought by Plaintiff.

[11] It should be noted that Stephens offered a sample size of three candidates – this is extremely problematic for a pattern and practice claim. *See Gurerro v. Ashcroft*, 253 F.3d 309, 315 (2001) (dismissing pattern and practice claim where Hispanic FBI agent was passed over for a promotion in favor three white agents - "this sparse evidence hardly constitutes a trend.")

17

proffered reasons were merely pretextual – he has not done so. Accordingly, the Defendants' Joint Motion for Summary Judgment on all claims is GRANTED.

IT IS SO ORDERED.

1/23/08
Dated

The Honorable William J. Hibbler
United States District Court