CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 08-1416

LESLEY C. STEPHENS,

*Plaintiff-Appellant,*

*v.*

CHARLES ERICKSON, KEVIN MURRAY,
MICHAEL PICARDI, GLEN TATARA, and
WILLIAM LONERGAN, in their individual
capacities as agents of THE CITY OF CHICAGO;
and THE CITY OF CHICAGO,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 0176—**William J. Hibbler**, *Judge*.

———————

ARGUED JANUARY 6, 2009—DECIDED JUNE 30, 3009

———————

Before KANNE, WOOD, and SYKES, *Circuit Judges*.

KANNE, *Circuit Judge*. Lesley Stephens, an employee of
the City of Chicago, interviewed for four separate promo-
tions between August and October 2004. The City
selected another candidate to fill each position. Stephens
sued the City, alleging that he was denied a promotion

in retaliation for filing a prior lawsuit and complaining of discrimination within his department. He also claims that his superiors further retaliated against him by altering the conditions of his employment. The district court granted summary judgment for the defendants on all counts. After considering Stephens's arguments and the record below, we agree that summary judgment was appropriate.

## I. BACKGROUND

Lesley Stephens began working for the City of Chicago in 1979, when he was hired as a truck driver by the Department of Fleet Management ("Fleet"). In December 1985, Stephens was promoted to acting foreman.[1] Around one year later, in early 1987, the City appointed Stephens to be acting assistant superintendent at Fleet, a position that required him to supervise approximately 144 employees at twelve locations. Later that same year, Stephens was reassigned to his original position as a truck driver, and in early 1988, he suffered a back injury and took disability leave.

---

[1] In this context, the term "acting" refers to the City's practice of appointing a current employee to fill an open position, often a supervisory one, for a limited time. *See generally Jackson v. City of Chicago*, 552 F.3d 619, 622-23 (7th Cir. 2009). A benefit of being appointed to "act up" is that the employee obtains training and experience that he would not otherwise receive. *See id.* at 622.

Stephens did not work for the City again until 1993, when he returned to Fleet as an accident adjuster, a position he has held ever since. His duties include evaluating, appraising, and photographing damaged City vehicles, as well as obtaining maintenance estimates from outside repair shops.

In 1997, Stephens, who is African American, filed a lawsuit alleging that the City engaged in racially discriminatory hiring and promotional practices. The parties eventually settled the dispute on July 6, 2004. Stephens now alleges that he also complained about racial discrimination before and after his settlement, including lodging internal grievances, writing letters to the Mayor of Chicago, and filing charges with the Equal Employment Opportunity Commission.

Shortly after Stephens settled his lawsuit, he applied for four supervisory positions, three of which were within Fleet and one that was in the Department of Aviation. Stephens was interviewed but was ultimately passed over for each promotion. He now asserts that the City refused to promote him in retaliation for his 1997 lawsuit and history of discrimination complaints, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Because Stephens claims that each promotional decision was retaliatory, we briefly explain the City's promotional process and the circumstances surrounding the promotions.

### A. The Promotional Process

For each job opening, a City employee interviewed Stephens and several other candidates. The interviewers used a standard Hiring Criteria Rating Form, on which they rated each candidate based on a variety of metrics, such as the applicant's prior supervisory experience, and then calculated an overall numeric score. The interviewers, who did not have authority to hire, then recommended that the candidate with the highest score receive the promotion.

Defendant Michael Picardi, the Commissioner of Fleet,[2] possessed the final hiring authority for all positions within the department. Picardi explained, however, that he often delegated his authority over personnel decisions to Al Fattore, then the Deputy Commissioner of Administrative Services. Typically, after Fattore obtained approval from the City to fill an open position, he would direct Laura Johnston, an administrative services officer, to generate an interview list from the Department of Personnel, schedule interviews, and assemble the necessary paperwork. After the interviews, Johnston would review the Rating Forms and prepare a hiring package for the candidate whom the interviewer rated the highest. Johnston possessed the authority to sign Commissioner Picardi's name on the hiring form to approve the candi-

---

[2] In August 2005, subsequent to these events, Picardi was appointed to serve as the Commissioner of the Department of Streets and Sanitation.

date's hire. Stephens agreed when opposing defendants' motion for summary judgment that Picardi did not delegate the final hiring authority to Fattore or Johnston, a position he maintains on appeal.

Finally, Picardi testified that he and his delegates relied exclusively on an interviewer's hiring recommendation, and that during his tenure at Fleet, he had never overruled such a recommendation. In the case before us, the highest-rated candidate was selected for each open position. Picardi testified that he did not discuss the promotions in question with anyone, including the interviewers, and he was not personally involved in the promotional decisions.

### B. The Three Fleet Department Positions

Stephens applied for three managerial positions within Fleet, each of which involved overseeing the maintenance of City vehicles. On August 27, September 10, and September 22, 2004, the City[3] interviewed Stephens and several other applicants for each open position. At that time, none of the interviewers knew about Stephens's prior lawsuit or his discrimination complaints; one interviewer did not know Stephens at all prior to the inter-

---

[3] Defendant Kevin Murray conducted the August 27 interview; defendant Charles Erickson conducted the September 10 interview; and defendant Glen Tatara conducted the September 22 interview. For purposes of this discussion, we refer to them jointly as the "interviewers."

view. None of the interviewers discussed any applicant with Commissioner Picardi.

All three interviewers asked each candidate the same questions, and each interviewer ultimately awarded the highest rating to a candidate other than Stephens. In each case, the interviewer cited the winning applicant's prior experience, recent job performance, or specific positive attributes relevant to the position. For example, the first successful applicant was serving as an acting manager and had helped convert Fleet to a new computer database; the second was serving in a supervisory role and previously oversaw a ten-month analysis of Fleet's inventory; and the third had prior relevant experience at a car dealership and had performed well on certain assigned tasks. Each of the successful candidates also indicated a willingness to work any shift.[4]

The interviewers did not consider Stephens to be an equally attractive candidate. They acknowledged that Stephens possessed some prior supervisory experience, but they believed it not to be as broad or pertinent as that of the other candidates. Further, at least one interviewer noted that he could not tell from

---

[4] In each application, Stephens indicated on a "Willingness and Ability Statement" that he would have difficulty working the first shift (11:00 p.m. to 7:00 a.m.) and the third shift (3:30 p.m. to 11:30 p.m.). The second shift, which apparently Stephens preferred, ran from 7:00 a.m. to 3:30 p.m.

Stephens's resume when he served in his prior positions.[5]
The interviewers were also underwhelmed by Stephens's
demeanor during the interviews. In response to one
question about what he would do "to move the department
forward," Stephens responded, "Don't know yet." Another
interviewer noted that Stephens came across as "a bit
arrogant" and that he "didn't think that was going to
be good for grouping people together for one common
cause." As a result, each interviewer awarded Stephens
with a rating that placed him at or near the bottom of
the applicant pool. In each case, the interviewer recom-
mended that the City hire the highest-rated applicant.

## C. The Department of Aviation Position

The fourth and final position for which Stephens
applied was Manager of Vehicle Maintenance at O'Hare
International Airport.[6] Stephens was one of four can-
didates interviewed by Defendant William Lonergan, the

---

[5]  Stephens's resume grouped his previous positions with the
City into one entry, which was dated "10/79 to Present." He did
not indicate when he served in each position. At the time of
the interviews, Stephens had not worked in a supervisory
role since 1987.

[6]  Although the record is not clear on whether this position fell
within Fleet or the Aviation Department, the parties do not
dispute that the interviewers for this job were supervisors in
the Aviation Department, nor, as we mention below, that
Commissioner Picardi was not the final hiring authority for
this position.

Deputy Commissioner of the Aviation Department.
Lonergan had never met Stephens before the interview, did
not know of Stephens's prior complaints against the
City, and did not discuss Stephens's application with
Commissioner Picardi.

After asking each candidate the same questions,
Lonergan rated Walter West the highest. Lonergan ex-
plained that West had greater budgetary and supervisory
experience, which included serving as Stephens's super-
visor for a time. Lonergan rated Stephens much lower,
expressing particular concern over Stephens's demeanor.

Unlike the other three job openings, Commissioner
Picardi was not the final hiring authority for this position.
That person was John Roberson, the Commissioner of the
Aviation Department, and he also interviewed West.
Roberson considered West to be the best qualified candi-
date and subsequently hired him. Roberson did not
know Stephens, nor did he know about any of his
prior complaints against the City, and he did not
discuss the open position with Commissioner Picardi.

Stephens notes some questionable circumstances sur-
rounding West's promotion. In late September 2004, a
few weeks *before* the October 12 interviews, a group of
coworkers held a going-away party for West. West alleg-
edly informed his coworkers that he had been hired for
a job at O'Hare. He then assumed his position on
October 14, just two days after the interview. When
asked about the questionable timing, West explained
that he interviewed previously for an airport manager
position in the spring of 2004, and he was told that

he would get the job pending some paperwork. Lonergan and Roberson recalled interviewing for the airport manager position, but Lonergan could not recall offering the job to West or anyone else.

### D. Other Allegedly Retaliatory Conduct

In addition to the failure to promote, Stephens alleges that his supervisors retaliated against him in other ways. Stephens asserts that an accident adjuster typically performs, among other tasks, estimates and evaluations of damaged City vehicles. After he settled his lawsuit in 2004, however, he alleges that his supervisors assigned him to menial components of his job by relegating him to photographing damaged vehicles at a Fleet garage, thus prohibiting him from using his "skill and expertise." On the rare occasion he gets to leave the garage, he is assigned to undesirable and dangerous locations outside of his typical territory. Stephens also claims that his supervisors physically isolated him from other accident adjusters and intimidated him by staring and yelling.

### E. Statements by Other City Employees

To support his contention that all of the above actions were perpetrated in retaliation for his 1997 lawsuit and history of discrimination complaints, Stephens proffers

the statements of several Fleet employees.[7] The primary source of these statements was Ruth Figueroa, a coworker who served as a supervisor and service writer for Fleet. Figueroa's work station was, by her estimate, approximately ten feet from where Stephens worked.

First, Figueroa testified that Millie Velazquez, administrative assistant to Commissioner Picardi, told her that Picardi said that he was upset with Stephens for making so many complaints and writing letters to the Mayor. Figueroa also testified that Velazquez said that she considered Stephens to be a problem, that she would make things difficult for him, and that he would never be promoted.

Second, Figueroa testified regarding comments by Laura Johnston, the administrative services officer mentioned previously. According to Figueroa, Johnston frequently "vented" about Stephens because she had to add his name to the interview list on occasion. Figueroa quoted Johnston as saying, "That damn Les. I have to change the applications."

Third, Figueroa testified about her own observations of Stephens's alleged mistreatment. She believed that supervisors at Fleet were treating Stephens differently than other employees in his position, including giving others assignments perceived to be more desirable. It

---

[7] The district court determined that a number of the statements in question were inadmissible hearsay. Stephens claims the district court erred in making this determination. We address Stephens's arguments below in part II.C.

was her belief that this conduct was because "they just didn't want to deal with Les Stephens." She also claimed that the City directed its employees to request work from accident adjusters other than Stephens.

Figueroa stated that she never discussed Stephens with Commissioner Picardi or any of the four individual defendants. Figueroa was asked during her deposition: "So if any of [the defendants] had any complaints about Les Stephens, you would have heard about that from what someone else told you; is that correct?" Figueroa responded, "That's correct."

### F. The District Court's Decision

Stephens filed this lawsuit on January 12, 2006, alleging retaliation by the City of Chicago and its individual agents in violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e-3(a). The City moved for summary judgment on all of Stephens's claims. The district court granted the City's motion, resting primarily on the lack of evidence demonstrating that the promotional denials were the result of retaliation rather than a legitimate hiring process. The court noted that none of the interviewers knew of Stephens's prior lawsuit or complaints, yet each scored him below the successful applicant with reasonable explanations for doing so. Further, the court could not discern any evidence indicating that Commissioner Picardi harbored animosity toward Stephens or that he exercised control or influence over the promotional processes. Picardi did not discuss Stephens's interviews with anyone and did not participate in the

interviews in any way. Without such evidence, the district court determined that there was no genuine issue of whether Picardi or the individual interviewers retaliated against Stephens.

## II. ANALYSIS

Stephens claims that the district court erred by granting summary judgment against him. We review *de novo* the grant of summary judgment, and we construe all facts in the light most favorable to Stephens, the nonmoving party. *See Jones v. City of Springfield, Ill.*, 554 F.3d 669, 671 (7th Cir. 2009). Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party must point to specific facts showing that there is a genuine issue for trial, and inferences relying on mere speculation or conjecture will not suffice. *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Stephens alleged that the City and its agents retaliated against him in violation of Title VII and § 1981. Title VII forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted,

or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). Similarly, the Supreme Court has determined that § 1981, which prohibits racial discrimination in making and enforcing contracts, encompasses retaliation claims. *See CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951, 1954-55 (2008). We apply the same elements to retaliation claims under Title VII and § 1981, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1951 (2008), and the discussion that follows applies to Stephens's claims under both statutes.

A plaintiff may establish unlawful retaliation using either the direct or indirect method of proof. *Humphries*, 474 F.3d at 404. Under the direct method, Stephens must demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two. *Argyropoulos*, 539 F.3d at 733; *Humphries*, 474 F.3d at 404. Under the indirect method, the first two elements remain the same, but instead of proving a direct causal link, the plaintiff must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination. *Argyropoulos*, 539

F.3d at 733. Once a plaintiff establishes the *prima facie* case under the indirect method, the defendant must articulate a nondiscriminatory reason for its action; if he does, the burden remains with the plaintiff to demonstrate that the defendant's reason is pretextual. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007). Although Stephens asserted both methods before the district court, he now proceeds with his failure-to-promote claims under only the direct method, and we confine our discussion accordingly.

Stephens based his retaliation claims on (1) the City's failure to promote him, and (2) his supervisors' conduct affecting his work conditions. With respect to both claims, the parties agree that Stephens satisfied the first element of the *prima facie* case—he engaged in a statutorily protected activity when he filed his 1997 lawsuit and lodged repeated complaints about discrimination at Fleet. The second element is also undisputed with regard to Stephens's failure-to-promote claims; the retaliatory denial of a promotion is a materially adverse action. *See, e.g., Hall v. Forest River, Inc.*, 536 F.3d 615, 620-21 (7th Cir. 2008). As we discuss below, for Stephens's claims based on the City's actions affecting his working conditions, the parties dispute whether the City's actions were materially adverse.

The primary issue in this appeal is whether Stephens demonstrated a causal link between his protected activity and the City's actions. Stephens may establish such a link using either direct or circumstantial evidence. *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th

No. 08-1416                                                    15

Cir. 2006). Direct evidence of retaliation typically requires an actor's admission of discriminatory animus, *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009), but such evidence is predictably rare. A plaintiff may also prevail "by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779-80 (7th Cir. 2006) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Here, the district court determined that Stephens's mosaic was a few tiles short of creating an image of intentional discrimination.

Stephens presents three arguments on appeal. First, he asserts that he produced sufficient evidence that the City refused to promote him in retaliation for his prior discrimination complaints. Second, he similarly argues that the record supports his retaliation claims based on other adverse employment actions. Third, he claims that the district court improperly refused to consider some of his coworkers' statements after finding them to be "textbook hearsay."

### A. Retaliatory Failure to Promote

Stephens claims that the City denied him the four promotions in retaliation for filing his 1997 lawsuit and his history of opposing racial discrimination within Fleet. To establish the City's retaliatory motive, Stephens makes two related arguments that he claims are supported by the record. First, he argues that the interview process was a sham because the interviewers simply

selected the candidate whom they knew Commissioner Picardi preferred. This foreknowledge supposedly originated in Picardi's prior appointment of the preferred candidate to a supervisory position through the "acting up" system, which Stephens criticizes, stating that it is subject to abuse and provides an unfair advantage in securing future promotions. Second, Stephens asserts that Picardi, in fact, desired to retaliate against Stephens for his prior complaints, an objective he accomplished by influencing the promotional processes in favor of his preselected candidates. As we explain, Stephens has supported neither argument, and the district court properly granted summary judgment on his failure-to-promote claims.

Stephens's first argument relies on the inference that each interviewer aided Picardi in his quest to retaliate against Stephens. But Stephens has produced no evidence that *any* of the four interviewers knew of his 1997 lawsuit or his history of discrimination complaints. In fact, all four interviewers testified to the contrary, and two of them did not even know Stephens prior to the interview. Clearly, a superior cannot retaliate against an employee for a protected activity about which he has no knowledge. *See, e.g., Treadwell*, 455 F.3d at 782; *Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 866 (7th Cir. 2004). This alone dooms Stephens's claims against each of the defendant interviewers.

Beyond the interviewers' ignorance of Stephens's complaints, and even in the light most favorable to Stephens, the evidence indicates that the interview

process was reasonable and fair. For each position, Stephens was one of several applicants interviewed. Each interviewer evaluated the candidates' prior experience, asked them the same questions, rated them based on the same criteria, espoused reasonable, legitimate reasons for recommending one candidate over the others, and recommended the applicant with the highest score. We discern nothing from the record to indicate that the interviewers' ratings or recommendations were retaliatory or their reasons pretextual.

Stephens goes to great lengths to undermine the validity of the promotional processes. He calls them a "sham" and questions the credentials of each employee promoted. But to create an inference of retaliation based upon a difference in credentials, Stephens must offer more than "mere self-serving appraisals," *Forest River, Inc.*, 536 F.3d at 620 (quotations omitted), or his own subjective belief that he was as qualified as the successful applicant, *see id.*; *cf. Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002) (holding that differences in qualifications do not demonstrate pretext "unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue" (quotations omitted)).

Stephens offers no more than that here. Some interviewers cited his poor demeanor or answers to particular questions; some noted his unwillingness to work all shifts; others cited his lack of pertinent supervisory experience. Stephens refers to these reasons as a "sham,"

but he has nothing to support this characterization. He points to his experience supervising approximately 144 people, but he glosses over the fact that this experience came approximately seventeen years prior to the interviews. He repeatedly compares his ratings and qualifications to those of other unsuccessful candidates, but, notably, he does not demonstrate that his credentials were superior to those of the *successful* candidates. Our role is to prevent unlawful hiring practices, "not to act as a super personnel department that second-guesses employers' business judgments." *Millbrook*, 280 F.3d at 1181 (quotations omitted). We see nothing improper with the City's promotional processes.

Next, we move to Stephens's second argument and find nothing in the record to indicate that Commissioner Picardi, the only defendant with knowledge of his 1997 lawsuit, wanted to retaliate against him and did so by predetermining the successful candidates. First, Stephens has not produced sufficient evidence to show that Picardi harbored any animosity toward him. He relies on statements from Picardi's assistant, which we address below.

Second, even if we assume that Picardi wanted to retaliate against Stephens, Stephens has not demonstrated a triable issue of whether Picardi controlled, influenced, or even played a role the promotional decisions. The only connection Stephens makes between Picardi and the promotions in question is that Picardi previously appointed two of the successful candidates to "acting" positions, which allegedly informed the interviewers that Picardi preferred that candidate. But Stephens does

not argue, nor is there evidence to support, that his previous appointments of these "acting" managers were in retaliation against Stephens or that Stephens should have received those appointments.[8]

    More importantly, nothing in the record ties Picardi to any of the four interviews, the lower scores that Stephens received, or the interviewers' recommendations. Each interviewer testified that he did not discuss the promotions with Picardi before making his recommendation, and the record does not indicate that Picardi hand-picked Stephens's interviewers. To the contrary, Picardi testified that he was not involved, that he did not review the applications, and that he delegated much of the hiring process to Fattore. Most telling is that in his

---

[8] Although Stephens attacks the "acting up" process, he cannot create a separate claim regarding the underlying appointments, nor should we consider the propriety of those appointments as background evidence for his failure-to-promote claims. *See Jackson*, 552 F.3d at 623-24. In *Jackson*, the plaintiff challenged two promotional denials, primarily because the successful candidates gained an advantage through experience in "acting" positions. *Id.* at 622-23. We refused to consider the "acting up" decisions as a separate claim because the claim was untimely and not present in the EEOC charge. *Id.* at 623. We also noted that, as would be the case here, to use the prior "acting" appointments as background evidence "would require a mini-trial: What were the available 'acting up' positions? Who applied? What were the qualifications of those who were accepted? How did they compare to [plaintiff]?" *Id.* at 624. Further, even if we considered the "acting up" appointments as context, it does not change our analysis in this case.

years as Fleet's Commissioner, Picardi had never overruled an interviewer's hiring recommendation. Had Picardi strayed from that practice to *overrule* an interviewer's recommendation that he promote Stephens, our analysis would perhaps be different. The best Stephens can do is assert that Picardi influenced the promotional process to preselect the winning candidates, but no evidence supports this.

Finally, the promotion of Walter West to a managerial position in the Aviation Department merits some individual discussion. Stephens recounts the circumstances surrounding West's hire and going-away party. We agree that Stephens's allegations, which are arguably supported by his coworkers' testimony, raise some flags about the interview on October 12. But like the other instances, Stephens has not shown that he was more qualified than West, nor that the promotional decision was retaliatory. William Lonergan recommended West after interviewing him and three other applicants; Commissioner Roberson hired West after conducting a second interview. Lonergan and Roberson did not know Stephens, nor were they aware of his complaints. The most damaging fact for Stephens, however, is that this is the only promotion for which Commissioner Picardi was not the final hiring authority, making him even further removed from this decision than the others. And, to the extent there was any impropriety at all, the two other applicants who interviewed were equally wronged by the allegedly unfair process. Stephens cannot distinguish himself by showing that retaliation was the reason the City denied him the job. An argument that was a

stretch in the other instances is simply out of Stephens's reach regarding the Aviation promotion. Without more, Stephens cannot demonstrate retaliation.

In the end, the fundamental flaw in Stephens's case is that, no matter how strongly he personally believes that he should have received a promotion, he has not produced enough evidence to support an inference that the City acted in retaliation for his protected activity.

### B. Other Alleged Retaliatory Actions

In addition to being denied promotions, Stephens alleges that his supervisors retaliated against him when they assigned him menial job duties, occasionally required him to perform his job in dangerous neighborhoods, physically isolated him from other accident adjusters, and intimidated him by staring and yelling at him. The district court addressed these claims in a footnote and determined that they were not materially adverse actions. We agree that the adverse actions of which Stephens complains are not actionable.

Federal law protects an employee only from retaliation that produces an injury, and, therefore, an employer's retaliatory conduct is actionable only if it would be materially adverse to a reasonable employee. *Burlington Northern*, 548 U.S. at 68-69. Title VII "does not set forth 'a general civility code for the American workplace,' " *id.* at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)), and it does not protect an employee from trivial harms, petty slights, nor minor annoyances,

*id.*; *see also Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

In the retaliation context, conduct is "materially adverse" if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotations omitted); *Nagle*, 554 F.3d at 1119; *see also Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005). We apply an objective test, but whether a particular action is materially adverse will depend on the context and circumstances of the particular case. *Burlington Northern*, 548 U.S. at 68-69.

We can dismiss two bases for Stephens's retaliation claim relatively easily. First, the intimidation that Stephens allegedly suffered, which he summarily describes as being stared and yelled at, is not adequately supported by the record and is not an actionable harm. Second, although segregating an employee can be actionable retaliation, Stephens's alleged "physical isolation" does not rise to such a level. Stephens testified that the three accident adjusters in the department were each assigned to a different office, meaning that each one was equally isolated from the others. None were entirely isolated from other City employees. This is not the type of harm that Title VII contemplates, nor would it dissuade a reasonable employee from complaining of discrimination. *Cf. Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (stating that a "classic case" of a retaliatory change in working conditions is "the employee whose desk is moved into a closet").

Last, although a closer question, the alleged altera-
tions of Stephens's job responsibilities are not actionable
retaliation under Title VII and § 1981. Certainly, a sig-
nificant or substantial change to an employee's responsibil-
ities may be materially adverse, but every reassignment
is not automatically actionable. *See Burlington Northern*,
548 U.S. at 71. Whether a change in job responsibilities
is materially adverse "all depends on how much of a
change, and how disadvantageous a change, took place."
*Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir.
2003). Our decisions involving a transfer or reassignment
of job responsibilities indicate that such an action is not
materially adverse unless it represents a *significant* alter-
ation to the employee's duties, which is often reflected by
a corresponding change in work hours, compensation, or
career prospects. *See, e.g., Nagle*, 554 F.3d at 1119-20; *Lapka
v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008); *Grube v. Lau
Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001); *cf. Nichols*, 510
F.3d at 780-81 (finding reassignment similar to Stephens's
not materially adverse for race discrimination claim);
*Washington*, 420 F.3d at 662 (noting that "[b]y and large
a reassignment that does not affect pay or promotion
opportunities lacks th[e] potential to dissuade and thus
is not actionable").

Stephens relies on *Burlington Northern*, in which
the Supreme Court clarified that a retaliatory action is
materially adverse when it would dissuade a reasonable
employee from filing a charge. 548 U.S. at 68 (citing

*Washington*, 420 F.3d at 662).[9] In that case, the employer reassigned the plaintiff, a female, from operating a forklift to performing standard railroad track laborer tasks. *Id.* at 70. The Court noted that "the forklift operator position required more qualifications, which is an indication of prestige; . . . was objectively considered a better job and the male employees resented [plaintiff] for occupying it." *Id.* at 71 (quotations omitted). The track laborer tasks, however, "were by all accounts more arduous and dirtier." *Id.* (quotations omitted). Because of the significant differences between the two jobs, the Court

---

[9] Stephens asserts that *Burlington Northern* broadened the scope of "materially adverse" retaliatory conduct. He is correct in one sense: the Court held that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." 548 U.S. at 67. But we took this approach prior to *Burlington Northern*. *See Washington*, 420 F.3d at 661 ("Although the anti-retaliation rule in § 2000e-3(a) is broader than the anti-discrimination rule in § 2000e-2(a) in the sense that it extends beyond pay and other tangible employment actions, nothing in § 2000e-3(a) says or even hints that the significance or materiality requirement has been dispensed with."). Further, the retaliatory acts that Stephens allegedly suffered *are* employment-related, making this component of the Court's decision inapplicable. To the extent that the Court clarified the test for measuring the requisite *materiality* of an adverse retaliatory act, it adopted the test that we previously applied in *Washington*. *See Burlington Northern*, 548 U.S. at 67-68. Therefore, we consider our decisions under *Washington* and its predecessors to be consistent with *Burlington Northern*.

held that a jury could conclude the reassignment was materially adverse. *Id.*

We find the change in job responsibilities in *Burlington Northern* to be distinguishable from Stephens's reassignment to photographing vehicles, sending vehicles to repair shops for estimates and repair, and occasionally being sent to purportedly dangerous neighborhoods. Simply put, even accepting Stephens's assertions as true, the City altered his job duties only minimally. His new tasks are not dirtier, more arduous, less prestigious, or objectively inferior, nor do they possess any analogous attribute.

Stephens alleges that his tasks were "less desirable," but he does not allege that he was the only accident adjuster required to perform these duties, that other employees resented him for his prior responsibilities, or that the change in duties affected his compensation, work hours, or chances for a promotion. Although these impacts on an employee's job may not be essential to an actionable retaliation claim, they reflect the sort of harm that would typically dissuade a reasonable employee from making a discrimination charge. Stephens's new duties are well within his job description, differ minimally from his old duties, and do not prevent him from using his "skill and expertise" to such an extent that the reassignment is materially adverse. *Cf. Tart v. Ill. Power Co.*, 366 F.3d 461, 473 (7th Cir. 2004) (holding that reassignment was actionable for a discrimination claim where new duties "were objectively inferior; they involved *far* less skill and *significantly* harsher working conditions than the plaintiffs' prior positions" (emphases added)).

Our post-*Burlington Northern* cases support our holding. *See, e.g.*, *Nagle*, 554 F.3d at 1119; *Lapka*, 517 F.3d at 986. For example, in *Nagle*, the defendant reassigned a police officer from patrol duty to "strip mall detail" and a newly created "senior liaison" position, both assignments the officer claimed were undesirable and objectively inferior. 554 F.3d at 1119. We held that the reassignments were not actionable, noting that they did not change the officer's pay, hours, or prospects of advancement, and "the senior liaison position had to be filled by someone and an employer is entitled to fill the position." *Id.* at 1120.

Similarly, in *Lapka*, an adjudication officer complained that her employer assigned her to handle cases that she alleged were more difficult and time-consuming, while stripping her of more interesting duties. 517 F.3d at 986. We noted that handling such cases was already part of her job, and the reallocation of her work did not significantly alter her responsibilities. *Id.* Specifically, the plaintiff "was not required to work extra hours, did not suffer any loss of pay and was not disciplined for failing to complete her work." *Id.* We even rejected her argument that the increased case load caused her to fall behind in her work and receive a lower performance rating, noting that performance ratings are not actionable unless they are accompanied by tangible job consequences. *Id.* (citing *Whittaker v. N. Ill. Univ.*, 424 F.3d 640 (7th Cir. 2005)).

We do not mean to suggest that altering one's job duties within the scope of one's job description can never be materially adverse; the Supreme Court has decided that issue. *See Burlington Northern*, 548 U.S. at 71. But here,

No. 08-1416 27

the alterations to Stephens's job were insufficient to dissuade a reasonable employee from filing a discrimination charge. Therefore, we agree that summary judgment is appropriate.

### C. Out-of-Court Statements by City Employees

Last, we address the district court's determination that certain statements by City employees were "textbook hearsay." To prove the City's retaliatory motive, Stephens relies heavily on Figueroa's testimony relaying comments made by two Fleet employees, Millie Velazquez and Laura Johnston. The district court determined that the comments were either hearsay or irrelevant to the issue of whether Stephens was terminated for a retaliatory purpose.

According to Figueroa, Velazquez, who was then Commissioner Picardi's administrative assistant, stated that Picardi was "very upset" about Stephens's constant complaints, that she heard other negative comments about Stephens attributed to Picardi, and that she (Velazquez) would make things hard for Stephens. Stephens asserts on appeal that Velazquez's comments should be treated as non-hearsay admissions by a party-opponent.

Because Velazquez's comments were out-of-court statements offered for their truth, *see* Fed. R. Evid. 801(c), Stephens must establish that an exception applies or that

the statements are non-hearsay.[10] Admissions by a party-opponent are governed by Rule 801(d)(2)(D) of the Federal Rules of Evidence, which provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The central question regarding Velazquez's statements is whether they concerned a matter within the scope of her employment.

We have acknowledged that the law in this area is "somewhat muddled," *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003), and "not everything that relates to one's job falls within the scope of one's agency or employment," *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998). For an agent's statement regarding an employment action to constitute an admission, she need not have been personally involved in that action, but her duties must encompass some responsibility related to "the decisionmaking process affecting the employment action." *Simple v. Walgreen Co.*, 511 F.3d

---

[10] In fact, Figueroa's statements include two separate out-of-court statements, the primary statement being Picardi's comments, and the second statement being Velazquez's recitation of them. Stephens must establish an independent basis for admitting both statements, *see* Fed. R. Evid. 805, but, as the ensuing discussion will make clear, Picardi's comments qualify as an admission by a party opponent under Fed. R. Evid. 801(d)(2)(D). Therefore, we focus solely on Velazquez's statements.

668, 672 (7th Cir. 2007); *see also Pharmacia, Inc.*, 137 F.3d at 951.

In *Pharmacia,* for example, after expressing our reluctance to impose a "personal involvement" requirement, we nevertheless found that complaints voiced by employees were not admissions because "[n]one of the women were agents of Pharmacia for the purpose of making managerial decisions affecting the terms and conditions of their own employment." 137 F.3d at 950; *see also Simple*, 511 F.3d at 672 (finding an admission because employee supervised and reviewed plaintiff, and consulted the decision-maker about the allegedly discriminatory appointment); *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 630-31 (7th Cir. 2006); *cf. Nekolny v. Painter*, 653 F.2d 1164, 1171-72 (7th Cir. 1981) (finding admissions where declarant was an "advisor" to the decision-maker, participated in interviews, discussed employees' performance, and communicated news of termination); *Aliotta*, 315 F.3d at 762 ("While the hiring/firing/promoting/demoting decisionmaking authority of the declarant may be critical in employment cases in which the admission deals with hiring/firing/promoting/demoting-type decisions, no similar requirement exists in other contexts.").

The parties agree that Velazquez was not personally involved in the promotional decisions at issue. Furthermore, the record demonstrates that Velazquez's assigned duties as an administrative assistant did not involve any component of Fleet's promotional or hiring process, nor did Velazquez possess authority to supervise, manage, review, promote, hire, fire, or recommend any employ-

ment action regarding any of the candidates. "[T]he subject matter of the admission [must] match the subject matter of the employee's job description." *Aliotta*, 315 F.3d at 762. That is not the case with Velazquez's statements about what Commissioner Picardi said, and they are inadmissible hearsay.

Moreover, even *if* Velazquez's statements were admissible, they do not help Stephens. As we found above, Stephens did not connect Picardi to any of the four promotions. Thus, even if we assume Picardi was upset with Stephens, the evidence does not indicate that Picardi influenced the promotional process or otherwise retaliated against Stephens.

Next, Velazquez's statements reflecting her own personal feelings about Stephens are irrelevant to Stephens's claims. As we have just mentioned, Velazquez possessed no authority to hire, fire, promote, or demote. Any animosity she might have felt toward Stephens is not probative of any issue related to his failure-to-promote claims. Velazquez is not accused of personally retaliating against Stephens, and the district court properly declined to consider her statements.

Figueroa also testified that Laura Johnston, an administrative services officer, complained to her about Stephens and once said, "That damn Les. I have to change the applications." As an administrative officer in the personnel department with authority to create interview lists and sign Commissioner Picardi's name, Stephens has a much better claim that Johnston's statements were admissions by a party-opponent. But the district court did not hold otherwise. Instead, it determined that Johnston's

alleged statements to Figueroa were not probative of any material issue, and we agree.

Even if we accepted Stephens's assertion that Johnston was exasperated with him, she admitted during her deposition that she never discussed Stephens with Picardi, she did not make any of the promotional decisions, and the highest rated applicants received the jobs. Stephens presents no evidence to the contrary. Whether she was frustrated with him does nothing to prove that Stephens was passed over for a promotion based on his prior protected activity. At best, Johnston added Stephens to an interview pool from which he might otherwise have been excluded. He subsequently interviewed with individuals who did not know of his prior complaints, and he still received lower scores than the successful candidate in each. Johnston's statements do not create a genuine issue for trial.

### III. Conclusion

Stephens's failure-to-promote claims rely on creating a causal chain from Commissioner Picardi's frustration over Stephens's prior complaints, to the "acting up" appointments, to the four promotions at issue, to the interviewer's decisions, and back to Picardi's approval of the promotions. Too many links in this chain are missing for want of evidentiary support. For the above reasons, we find that Stephens has not produced evidence creating a genuine issue of material fact for trial, and we AFFIRM.